IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRYAN E. FISCHER,

            Plaintiff,

    v.

G4S SECURE SOLUTIONS USA,
INC.,

            Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 10-6792 (JBS/AMD)

**OPINION**

Appearances:

James M. Carter, Esq.
LAW OFFICES OF HOFFMAN DIMUNZIO
4270 Route 42
Turnersville, NJ 08012
    Attorney for Plaintiff

John K. Bennett, Esq.
Leslie Ann Marie Saint, Esq.
JACKSON LEWIS P.C.
220 Headquarters Plaza
East Tower, 7th floor
Morristown, NJ 07960
    Attorneys for Defendant

**SIMANDLE, Chief Judge:**

**I.  Introduction**

Plaintiff Bryan Fischer brings this action alleging that he was terminated from his job in retaliation for engaging in protected whistleblowing activity, in violation of Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq.

Plaintiff, formerly an armed security officer at a nuclear power facility, alleges that he was constructively terminated after disclosing to his supervisors unsafe conduct by his union co-workers. In response, some co-workers made complaining statements to Plaintiff, and Defendant placed him on leave with pay in order to investigate his allegations of harassment. After concluding the investigation, Defendant offered Plaintiff two options: (1) a transfer to the nearest facility with which Defendant had a contract (in New Hampshire, for less pay and with a reduction in Plaintiff's union seniority due to the different union contract there), or (2) return to work with assurances that changes were being made to the workplace and that harassment by his co-workers would not be tolerated. (Defendant rejected a third option: Plaintiff's $800,000 demand for severance.) Plaintiff declined the transfer and never returned to work because he felt that Defendant had not adequately addressed his safety concerns. Officially, Plaintiff was fired for not reporting to work. He maintains that he was constructively terminated.

Before the Court is a motion for summary judgment by Defendant G4S Secure Solutions USA, Inc. [Docket Item 40.] For the reasons explained below, because much of Plaintiff's conduct does not qualify for protection under CEPA, and because Plaintiff cannot establish causation or show that Defendant's

proffered reason for his termination was pretextual, the Court will enter summary judgment in favor of Defendant.

## II.   Background

### A.   Facts

#### 1. Plaintiff's disclosures

The facts are undisputed, except where noted. In 2007, Defendant G4S Secure Solutions USA, Inc., hired Plaintiff Bryan Fischer as an armed security officer and assigned him to the PSEG Salem-Hope Creek nuclear power facility,[1] where G4S provided security services on a contract basis. (Statement of Undisputed Material Facts ("SMF") ¶¶ 1, 4-6.) After a few months of employment, Plaintiff joined a security officers' union, the Nuclear Power Plant Security Officers of America. (SMF ¶3.) Over the course of his employment, Plaintiff received training materials and attended numerous training sessions on safety, ethics, misconduct, and harassment in the workplace. (SMF ¶¶ 11-18.)

Between April 2008 and February 2010, Plaintiff was involved in three incidents in which he provided his employer with information about what he considered to be safety concerns at the facility. (Defendant disputes that the information

---

[1] The parties refer to the Salem Nuclear Power Plant and Hope Creek Nuclear Generating Station, collectively, as "Salem-Hope Creek." The facilities are operated by PSEG Nuclear, LLC. (Am. Compl. ¶ 9.)

disclosed had any bearing on safety. (SMF ¶ 95.)) Plaintiff asserts that these incidents provoked threatening or harassing responses from union co-workers, and set in motion a course of events that led to Plaintiff's termination.

The first incident occurred in April 2008. A manager in PSEG's security department asked Plaintiff if he was aware of any unauthorized chairs on site in which security officers might sit without permission. (SMF ¶ 19.) Plaintiff identified a chair "on one of the elevations that was used to prop open the roof door." (SMF ¶ 20.) At the manager's direction, Plaintiff and a union co-worker removed the chair. (SMF ¶¶ 21-22.) On April 17, 2008, Officer Manny Perdue was seated behind Plaintiff at a meeting, and kicked the back legs of Plaintiff's chair. (SMF ¶ 23.) Plaintiff complained, and a union representative facilitated an apology from Perdue, which Plaintiff accepted. (SMF ¶¶ 24-31.) Perdue was later fired for an unrelated reason. (Deposition of Arthur R. Simpson, Sr. (Def. Ex. D) [Docket Item 40-12] at 78:7-12, 82:19-83:2.)

One year later, Plaintiff was patting down and searching visitors to the facility, when he discovered one visitor had a digital camera without a "camera pass" authorizing the visitor to carry a camera into a protected area of the facility. (SMF ¶¶ 32-36.) Plaintiff believed that Officer Glasby, who had allowed the visitor to enter without a camera pass, had violated

4

security protocol, and Plaintiff told the security team leader on duty. (SMF ¶¶ 37-38.) About 10 or 12 days later, Officer Glasby confronted Plaintiff and asked: "What are you trying to do jam me up?" (SMF ¶ 40.)

The third incident occurred on February 14, 2010, at the beginning of Plaintiff's shift. (SMF ¶ 42.) He smelled alcohol on the breath of his co-worker Officer Crowell and inquired whether Crowell had been drinking. (SMF ¶¶ 42-43.) Crowell replied that he had some drinks the night before but felt fine. (SMF ¶ 44.) Plaintiff believed that security officers were required to self-report if they were intoxicated or if they had been under the influence of alcohol within five hours of reporting for duty, and Plaintiff instructed Crowell to report to the team leader. (SMF ¶¶ 45-46.) When Plaintiff informed Officer Terry Snyder, the union's vice president, about the situation, they both accompanied Crowell to the locker room to take a fitness-for-duty Breathalyzer test. (SMF ¶¶ 48-50.) Crowell failed the test and was terminated immediately. (SMF ¶¶ 50-51.)

As to each of these three incidents, Plaintiff does not allege that his employer ignored his reports or failed to take proper action. Indeed, as to the third and most serious report of misconduct, involving Officer Crowell's use of alcohol, Plaintiff admits "the employer did the right thing at the time

and terminated that employee." (Pl. Supp. Letter Br. [Docket Item 48] at 2.)

### 2. Reaction to Plaintiff's conduct

Some of Plaintiff's co-workers expressed dissatisfaction with Plaintiff's behavior and Crowell's termination. Officer Perdue showed Plaintiff text messages that read, "Fischer is going to get his," and "Fischer's no good, why you talk to him?" (SMF ¶¶ 52-54.) One officer told Plaintiff that "he needed to stop reporting things" and that if they were in the military, other officers "would pay him a visit at night." (SMF ¶ 57.) Plaintiff observed that when he entered the security officers' break room, some union officers would leave the room. (SMF ¶ 56.) Two months after Crowell's termination, Officer Glasby relieved Plaintiff from his shift, and asked why Plaintiff was squinting his eyes and clenching his fists, and if he were going to hit Glasby. (SMF ¶ 59.) Plaintiff contends he was doing none of those things and thought Glasby was trying to provoke him or set him up. (SMF ¶ 60; Counterstatement of Material Facts ("CMF") [Docket Item 42] ¶ 12.) Plaintiff discussed with Officer Snyder the possibility of contacting PSEG's Employee Concerns Program ("ECP"), about this treatment by his co-workers. (SMF ¶¶ 61-65.) The next day, the union president, Anthony Rizzo, told Plaintiff: "I hear you're going to contact Employee Concerns. Go

ahead and contact Employee Concerns and see where that gets
you." (SMF ¶ 66.)

Plaintiff contacted the manager of ECP, Mike Headrick, and
left a message requesting that Headrick call him back on his
cell phone. (SMF ¶¶ 67-69; CMF ¶ 16.) Instead, Headrick called
Plaintiff's supervisor, Dave Mizenis, who, over the radio,
relayed the message for Plaintiff to call "extension 2014,"
which Plaintiff feared would be recognized by his co-workers as
the ECP extension.[2] (SMF ¶¶ 70-73.) Headrick later apologized for
calling the supervisor, and arranged to meet Plaintiff that
evening, to discuss the work environment. (SMF ¶¶ 75-76.)
Plaintiff met with Headrick twice and reported that his co-
workers were treating him differently after the radio message to
call extension 2014; one officer had asked Plaintiff "what was
wrong with him" and "if he had a problem," and another asked,
"what's the matter with you, Fischer?" (SMF ¶¶ 79-82.) Headrick
promised to investigate. (SMF ¶ 83.)

Plaintiff also arranged meetings with Hunter Sawders,
project manager for G4S, and Brian Jacques, PSEG security
manager. (SMF ¶¶ 84-88.) Jacques suggested that Plaintiff be
assigned to administrative work in the building, to separate him
from his fellow union officers while the situation was under

---

[2] Plaintiff contends he was <u>certain</u> that others recognized the
extension. (CMF ¶ 18.)

review. (SMF ¶ 89.) Although Plaintiff reported to work in the administrative building at least twice, Rizzo informed Sawders that the union's collective bargaining agreement did not allow officers to perform such work. (SMF ¶ 96.) Consequently, on or around May 24, 2010, Plaintiff was placed on administrative leave with pay, pending an investigation. (SMF ¶ 98.)

G4S retained attorney Arthur Domby to investigate Plaintiff's concerns. (SMF ¶ 92.) Domby spoke with Plaintiff several times throughout the investigation, and as the investigation drew to a close, in July 2010, Domby told Plaintiff that he believed the work environment was being corrected. (SMF ¶¶ 99-102.) Domby said that any disciplinary action against union co-workers would be up to Sawders and G4S. (SMF ¶ 103.)

In August 2010, Plaintiff also contacted a field examiner at the National Labor Relations Board office in Philadelphia about filing unfair labor practice charges against the union and G4S. (SMF ¶¶ 105-06.) The field examiner drafted charges based on Plaintiff's representations, but Plaintiff ultimately decided not to sign or file charges. (SMF ¶¶ 107-09.) Plaintiff asserts that he told members of management, including Sawders, that he was considering filing NLRB charges. (CMF ¶ 33; Certification of Bryan Fischer ("Fischer Cert.") [Docket Item 42-1] ¶ 27.) Defendant contends that, because Plaintiff never filed charges,

8

neither G4S nor the union ever received notice of any NLRB charges. (SMF ¶¶ 110-11.)

### 3. Meetings with management

In September 2010, Plaintiff had a series of telephone conversations and in-person meetings with management of G4S and PSEG about whether and how Plaintiff could return to work. In the conversations, management reassured Plaintiff that they were taking his concerns seriously and that they would take necessary action to deal with anyone who gave Plaintiff trouble. Plaintiff surreptitiously recorded these conversations with a voice-activated recording device. (SMF ¶ 104.) Plaintiff later explained that he wanted to document "the honest truth of whatever [management] thought they were going to do" and "didn't want them to change their wording based on knowing that I had a recording device." (Fischer Dep. (Def. Ex. B) at 383:21-384:13.) He thought that recording the conversations would protect his "well-being." (Id. at 384:25-385:2.) As discussed next, the transcripts of Plaintiff's secret recordings document that Defendant's management took prompt and reasonable measures to protect Plaintiff from workplace harassment by co-workers and to preserve his employment.

### a. September 9, 2010

On September 9, 2010, Plaintiff met with Sawders and Robert Kindelein, who managed the Safety Conscious Work Environment

("SCWE") program for G4S, about returning to work. (SMF ¶¶ 13, 115.) Plaintiff secretly recorded the conversation, as noted. Both Sawders and Kindelein assured Plaintiff that changes were being made in the workplace and that management would have "zero tolerance" of harassment toward Plaintiff upon his return. (Tr. of 9/09/10 Conversation at 68:18-21). Sawders said:

> I want to make sure you know that I'm aware of the issues raised. Obviously, I've seen the investigation. There are some issues I still need to address with some of the force. Discipline will be issued wherever warranted. Coaching will be issued wherever warranted. . . . But I want you to know that I will take action on the parts that need to have action taken on them.

(Id. at 80:20-81:4.) Sawders explained that "the supervisors are going to quickly get some reigns put on them" and that "life is about to change for them." (Id. at 72:25-73:1, 74:4-12.) Sawders said he specifically discussed Plaintiff's situation with the supervisors so that "there's going to be a heightened level of awareness out there." (Id. at 81:9-10.) Sawders also reported that he spoke to, and provided reading material to, "every shift" and told the officers that "[t]his stuff about rats and snitches, that belongs in a prison. It doesn't belong here." (Id. at 74:15-21.) Kindelein added that "[t]here's going to be a lot of SCWE things addressed." (Id. at 74:13-14.) The managers pledged to take any action necessary and told Plaintiff that anyone who harassed Plaintiff would be "done." (Id. at 75:9-13, 81:2-10, 142:1-8; 145:17-18.) Sawders encouraged Plaintiff to

10

continue reporting safety violations through the proper chain of command but told him to report any instances of harassment directly to him. (Id. at 68:25-69:9, 71:20-22.) Sawders also discussed how Plaintiff would have to undergo a fitness-for-duty procedure, including drug testing, because he had been away from work for so long. (SMF ¶¶ 115-18.)

Kindelein also discussed with Plaintiff an allegation contained in the investigation report that Plaintiff reported that he caught an officer named Katie Harris sleeping. (Tr. of Conversation with Fischer, Kindelein & Sawders (Pl. Ex. F) [Docket Item 42-6] at 6:10-7:42.) Plaintiff responded that "[t]hat's a complete fabrication and lie" (id. at 7:12-13) and that "this is a union retaliation." (Id. at 11:17-18.) Kindelein replied: "I got to look into it." (Id. at 11:24.)

During this and subsequent conversations that Plaintiff recorded, Plaintiff expressed continued concerns about his safety. "I mean, do I think somebody's going to shoot me? No." (Tr. of 9/09/10 Conversation (marked as D-37 within Def. Ex. C.) [Docket Item 40-10 at 37] at 103:15-16.) "Did anybody say they're going to beat me up or anything that -- like that? No, but I've heard people aren't happy with [me]."[3] (Tr. of 9/10/10

---

[3] Mike Bruecks, PSEG's security director, responded: "Well, we're taking care of that. Okay? We're addressing those behaviors and actions of anybody who would even -- you know, because . . . we want you to be coming back into it, and we support you coming

11

Conversation with Fischer, Kindelein & Bruecks (marked as D-40 within Def. Ex. C) [Docket Item 40-10 at 62] at 100:10-14.) "I really believe that somebody, given the opportunity, could possibly do something physically. I mean, do I have concrete evidence? No, I don't. But . . . based on things I've heard and then were told to me . . . I probably feel that something like that could possibly happen to me." (Tr. of 9/10/10 Conversation with Fischer, Kindelein & Sawders (marked as D-42 within Def. Ex. C) [Docket Item 40-10 at 70] at 3:12-17.) Plaintiff added: "I mean, I'm a man. I can take it. And like I said, they might say, Fischer, you got a high receding hairline; Fischer, you're skinny. I mean, that's -- that's -- you know, I'm a man." (Tr. of 9/10/10 Conversation with Fischer, Kindelein & Bruecks at 101:14-17.) He was particularly concerned about "a situation that I would be in where somebody makes an accusation that he freaked out on me and -- and really they struck me and now -- now they're trying to come up with a story to defend what they did to me." (Id. at 102:2-6.)

### b. September 10, 2010

Talks continued the next day, with Mike Bruecks, PSEG's security director, which Plaintiff also secretly recorded. Bruecks told Plaintiff that he had seen the investigator's

---

back." (Tr. of 9/10/10 Conversation with Fischer, Kindelein & Bruecks at 100:15-22.)

report and PSEG supported Plaintiff's return and would take care
of any problems. (SMF ¶¶ 126, 129-30; Tr. of 9/10/10
Conversation with Fischer, Kindelein & Bruecks at 93:11-13,
100:15-22.) Bruecks said: "We all have to acknowledge that it's
not going to be a perfect ride, because of the . . .
investigation. We will take care of that, if anybody steps out
of line." (Id. at 103:13-16.)

        During a follow-up conference call, Kindelein asked
Plaintiff what G4S could do to alleviate his concerns, and
Plaintiff replied that he did not know. (SMF ¶¶ 127-28.)
Plaintiff discussed returning to work in such a manner that he
would be separated from officers who threatened him, but he
stated:

>       I won't want to say no specific names, because I really
>       don't have a specific name . . . -- I mean, there are a
>       few that I feel I could threatened by [sic], but I don't
>       want to reveal their names, because that would be unfair
>       to them, and pre-judgmental on my part.

(Tr. of 9/10/10 Conversation with Fischer, Kindelein & Sawders
(marked as D-42 within Def. Ex. C) [Docket Item 40-10 at 71] at
4:3-9.) Plaintiff also discussed the possible termination of
harassing officers, but Plaintiff acknowledged that such a move
could backfire:

>       MR. FISCHER: . . .  And obviously I'm hearing, you know,
>       you had reiterated that nobody's going to be terminated,
>       and -- and I understand that. I'm not going to tell you
>       how to do your job and how you would keep this force
>       intact.

MR. SAWDERS: Would terminating some people make you feel more comfortable?

MR. FISCHER: . . . in a way, it would, but then, in a way, I'd fear that what retaliation would come from them terminations. So, it is like a double-edged sword.

(Id. [Docket Item 40-11] at 8:18-9:2.)

Kindelein promised to speak with G4S corporate officials about options for Plaintiff. (SMF ¶ 132.) Plaintiff asked about being transferred to another G4S site. (SMF ¶ 133-34.) Kindelein advised that the nearest G4S site was Seabrook, N.H. (SMF ¶ 137.) When asked to suggest other options, Plaintiff floated the idea of a severance package. (SMF ¶¶ 138-39.) Sawders told Plaintiff that the attorney for G4S and Plaintiff's attorney would have to discuss these options, but that Plaintiff should continue the process of preparing to return to work, "just in case."[4] (SMF ¶ 141; Tr. of 9/10/10 Conversation with Fischer,

_____

[4] Plaintiff contends that he left the September 10, 2010 meeting believing that all three options were available to him (CMF ¶ 49) -- transfer, severance or returning to work with some safety measures. But the transcript of the conversation of September 10, 2010, does not contain any statements that could be reasonably construed as promises that Plaintiff unilaterally could elect transfer or dictate terms of a severance package. (See, e.g., Tr. of 9/10/10 Conversation with Fischer, Kindelein & Sawders [Docket Item 40-11 at 1] at 7:16-18 (Sawders telling Plaintiff: "obviously some things we can do; some things we can't. But we -- we need to know what you'd like. What are you thinking?"); see also id. at 24:23-25 (Sawders telling Plaintiff: "It doesn't mean we can do any of them, but I got to know, because maybe we can. I don't know. Some of these are outside of my authority . . . ."); see also Fischer dep. at 373:11-19 (admitting that Sawders told Plaintiff to continue the

14

Kindelein & Sawders (marked as D-42 within Def. Ex. C) [Docket Item 40-11 at 15] at 25:17-24.) Kindelein stated that "your health and safety is our most important priority right now." (Id. at 14:6-7.)

### c. Other correspondence and Plaintiff's termination

Plaintiff met with Sawders again on September 16, 2010. (SMF ¶ 142.) Sawders told Plaintiff that he could not create a position at the Salem-Hope Creek facility that would "keep [Plaintiff] away from other people that are of concern to you." (SMF ¶ 144; Tr. of 9/16/10 Meeting (marked as D-46 within Def. Ex. C) [Docket Item 40-11 at 28] at 4:5-9.) However, Plaintiff testified that, at some point, Sawders told him that Mizenis, the supervisor who relayed the message from ECP to Plaintiff over the radio, would not be assigned to Plaintiff's shift upon his return to work. (Fischer dep. at 347:13-17.) Sawders offered Plaintiff a transfer to Seabrook, N.H., but advised him that security officers there belonged to a different union, and Plaintiff would start anew in terms of salary and seniority. (Tr. of 9/16/10 Meeting at 4:12-5:11.) Plaintiff again raised the option of a severance package, but Sawders told Plaintiff he was only authorized to offer a transfer to New Hampshire, and

in-processing so that no time was lost, even as G4S explored other options).)

that the attorneys should confer about severance. (SMF ¶¶ 148-49.)

On September 24, 2010, Plaintiff's counsel sent G4S a letter rejecting the offer to transfer. (SMF ¶ 152.) In the letter, Plaintiff demanded a severance package of $800,000. (SMF ¶ 153; D-46 (within Def. Ex. C) [Docket Item 40-11 at 46] at 3.) G4S's attorney rejected Plaintiff's severance demand the same day, and instructed Plaintiff to contact management no later than September 27, 2010, to return to work or pursue the transfer.[5] (SMF ¶ 154.) The letter stated that if Plaintiff did not contact management by the close of business on September 27, 2010, G4S would deem him to have resigned voluntarily from his position. (SMF ¶ 154.) This dispute is immaterial because Defendant extended Plaintiff's reporting date, as next discussed.

Plaintiff contacted G4S on September 28, 2010. (SMF ¶ 155.) He told Charles Workman, the regional director for G4S, that he would not return to work until his attorney spoke with G4S's attorney and that he still feared for his personal safety. (SMF ¶¶ 156-58.) Workman replied that if Plaintiff did not return to

_____

[5] Plaintiff argues that Defendant does not assert that the G4S's attorney actually sent the letter on September 24, 2010, only that he prepared the letter on that date. (CMF ¶ 35.) Plaintiff asserts that the letter demanding Plaintiff to return to work was not received by Plaintiff's lawyer until September 28, 2010. (CMF ¶ 36.)

work on September 29, 2010, he would face discipline under the
union contract. (SMF ¶ 159.) Plaintiff did not report for work
on September 29. (SMF ¶ 160.) Plaintiff contends that he called
out "as permitted under the terms of the collective bargaining
agreement." (CMF ¶ 38.) Workman left Plaintiff a message
advising him to return to work on October 4, 2010, or he would
face disciplinary action under the collective bargaining
agreement. (Id.) Plaintiff's counsel advised G4S by letter that
Plaintiff would not be returning to employment at the facility.
(SMF ¶ 161; Def. Ex. C (marked as D-49) [Docket Item 40-11 at
50].) On October 8, 2010, Plaintiff received a certified letter
that his employment was terminated because he violated the
collective bargaining agreement by being a "no call, no show"
for work on September 29 and October 4. (SMF ¶ 162.) Plaintiff
considered himself constructively discharged. (CMF ¶ 39.)

    **B.  Procedural history**

    On November 16, 2010, Plaintiff filed a seven-count
Complaint in Superior Court of New Jersey, Gloucester County,
against G4S and Nuclear Power Plant Security Officers of
America, which Defendant removed to this Court.[6] [Docket Item 1.]
The Court granted the union's unopposed motion to dismiss, and,
after granting a separate motion to dismiss by G4S, permitted

---

[6] The Court has jurisdiction under 28 U.S.C. § 1332(a). (See Am.
Compl. [Docket Item 24] ¶¶ 3-8.)

Plaintiff to amend the Complaint. [Docket Items 14, 19 & 22.]
The Amended Complaint states a single cause of action under the
New Jersey Conscientious Employee Protection Act ("CEPA"),
N.J.S.A. 34:19-1, et seq.: "The plaintiff's termination was in
retaliation for him speaking out or threatening to speak out
about the defendant's inability or unwillingness to follow
safety requirements of the U.S. Nuclear Regulatory Commission
and for speaking out or threatening to speak out about unfair
labor practices to the National Labor Relations Board." (Am.
Compl. [Docket Item 24] ¶ 38.)

     The Court heard oral argument on Defendant's motion for
summary judgment on May 15, 2014, and received supplemental
briefing from the parties after argument.

**III.  Standard of review**

     A court shall grant summary judgment "if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A dispute is "genuine" if, based on the evidence in
the record, a reasonable jury could return a verdict for the
non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). A fact is "material" if it might affect the outcome
of the suit. Id. Rule 56 "mandates the entry of summary
judgment, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to

18

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## IV.  Discussion

Defendant contends that Plaintiff voluntarily abandoned his job when he chose not to return to work on September 29 and October 4, 2010. (Def. Mot. [Docket Item 40-1] at 2.) Defendant moves for summary judgment on the ground that "no reasonable juror could believe the Plaintiff was subject to any retaliatory conduct." (Id.) Defendant argues that Plaintiff fails to make out a prima facie case of retaliation under CEPA, and even if he could, he fails to present any evidence that the articulated reason for termination -- failing to show up for work on two days, as directed -- was pretextual. Plaintiff contends he is not required to establish a prima facie case, but that he is able to do so on the record. (See Pl. Opp'n [Docket Item 42] at 12-17; see also infra, n.8.) Plaintiff maintains that he was constructively terminated in retaliation for his protected activity, and that the "no call, no show" explanation for his termination was pretextual. (Pl. Opp'n at 16-17.)

### A. Statutory background

CEPA is a "whistleblower statute" that "creates a cause of action for an employee who is subjected to retaliation for

reporting workplace misconduct." Battaglia v. United Parcel
Serv., Inc., 214 N.J. 518, 555 (2013). The New Jersey Supreme
Court has recognized that "CEPA is a remedial statute that
'promotes a strong public policy of the State' and 'therefore
should be construed liberally to effectuate its important social
goal.'" Id. (quoting Abbamont v. Piscataway Twp. Bd. of Educ.,
138 N.J. 405, 431 (1994)). The statute provides:

> An employer shall not take any retaliatory action
> against an employee because the employee does any of the
> following:
>
> a. Discloses, or threatens to disclose to a supervisor
> or to a public body an activity, policy or practice of
> the employer . . . that the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or
> > regulation promulgated to law . . . ; or
>
> . . . c. Objects to . . . any activity, policy or practice
> which the employee reasonably believes:
>
> > (1) is in violation of a law, or a rule or
> > regulation promulgated pursuant to law . . . ; or
> >
> > (3) is incompatible with a clear mandate of public
> > policy concerning the public health, safety or
> > welfare or protection of environment.

N.J.S.A. 34:19-3. A plaintiff bringing a CEPA claim under
N.J.S.A. 34:19-3c must prove:

> (1) he or she reasonably believed that his or her
> employer's conduct was violating either a law, rule, or
> regulation promulgated pursuant to law, or a clear
> mandate of public policy; (2) he or she performed a
> "whistle-blowing" activity described in N.J.S.A. 34:19-
> 3c; (3) an adverse employment action was taken against
> him or her; and (4) a causal connection exists between
> the whistle-blowing activity and the adverse employment
> action.

Battaglia, 214 N.J. at 556 (quoting Dzwonar v. McDevitt, 177
N.J. 451, 462 (2003)). At oral argument, Plaintiff's counsel
clarified that the allegations here state claims under both
N.J.S.A. 34:19-3c(1) and 3c(3).

CEPA claims are governed by the burden-shifting framework
articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973). See Blackburn v. United Parcel Serv., Inc., 179 F.3d 81,
92 (3d Cir. 1999) ("the well-established burden-shifting
analysis that is used in federal discrimination cases involving
'pretext' claims is appropriately used in a CEPA case");
Massarano v. N.J. Transit, 400 N.J. Super. 474, 492 (App Div.
2008) (stating that the burden-shifting analysis used in New
Jersey Law Against Discrimination cases -- the McDonnell Douglas
framework -- should be applied to CEPA cases). Under this
framework, the employee bears the initial burden of establishing
a prima facie case, and then the burden shifts to the employer
to articulate a legitimate, non-retaliatory reason for the
employment decision. See Shellenberger v. Summit Bancorp, Inc.,
318 F.3d 183, 187 (3d Cir. 2003). If the defendant meets its
burden, the employee "must then prove that 'retaliatory animus
played a role in the employer's decisionmaking process and that
it had a determinative effect on the outcome of that process.'"

Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 501 (3d Cir. 1997)).[7]

**B. Plaintiff's certification**

As a preliminary matter, Defendant urges the Court to disregard Plaintiff's certification, attached to his opposition,

---

[7] Plaintiff argues that he does not need to establish a prima facie case if Defendant already has articulated a legitimate, non-retaliatory reason for its conduct. (Pl. Opp'n at 12.) Plaintiff argues that when "the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." (Id., quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983).) In Aikens, the district court entered judgment in favor of the defendant-employer after a full trial on the merits. Aikens, 460 U.S. at 713. The district court also denied the defendant's motion to dismiss for failure to establish a prima facie case at the close of the plaintiff's case-in-chief. Id. at 714 n.4. On appeal, the parties disputed whether the plaintiff had established a prima facie case. In making the statement quoted above, the Supreme Court observed that, after a full trial and after the plaintiff survived a motion to dismiss based on the evidence in the case-in-chief, the relevant question was not whether the plaintiff established a prima facie case but whether the plaintiff's job candidacy had been rejected for a discriminatory reason. See Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 221 (3d Cir. 2000) (declining to read Aikens expansively and stating that "it is clearly proper to instruct the jury that it may consider whether the factual predicates necessary to establish the prima facie case have been shown").

Here, the Court is asked to rule on Defendant's motion for summary judgment, which directly challenges the sufficiency of Plaintiff's evidence to establish the elements of a CEPA claim. Defendant also argues in the alternative that there was a non-retaliatory reason for Plaintiff's termination and that the stated reason was not pretextual. This case has not received a full trial on the merits. This Court has not denied a motion to dismiss based on Plaintiff's case-in-chief. Nothing in Aikens, or Plaintiff's other citations, relieves Plaintiff of his initial burden to establish a prima facie case of a CEPA violation under New Jersey law, at the summary judgment phase.

under the "sham affidavit doctrine." (Reply [Docket Item 43] at 5.) The doctrine provides that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 251 (3d Cir. 2007). Defendant contends that the certification contradicts Plaintiff's deposition testimony, but Defendant has not demonstrated any contradictions, and therefore the Court will not disregard the certification.

Defendant sees contradictions in the fact that Plaintiff, at his deposition, could not identify any law, rule or regulation that he reasonably believed was violated, and now he certifies that he believed there was a law, rule or regulation that was violated. (Reply at 7.) These two facts are not necessarily inconsistent: Plaintiff could reasonably believe that a law, rule or regulation existed, without being able to identify it specifically. The other alleged contradictions do not strike the Court as incompatible. Because Defendant has not identified contradictory statements of fact in his deposition and certification, there is no grounds to ignore the certification.

### C. Reasonable belief that G4S violated a law, rule, regulation or clear mandate of public policy

Defendant argues that Plaintiff has not established the first element of a prima facie CEPA violation because he "failed to identify any statute, regulation or clear mandate of public policy that G4S violated." (Def. Mot. at 9.) Defendant contends that Plaintiff must "enunciate the <u>specific</u> terms of a statute or regulation, or the <u>clear</u> expression of public policy, which would be violated if the facts alleged are true." (<u>Id.</u>) (internal quotation marks omitted). Defendant concludes that the "competent record evidence confirms that Plaintiff did not raise any 'safety issue' based on any <u>reasonable</u> belief that Defendant was violating any statute, regulation or clear mandate of public policy . . . ." (Def. Mot. at 11).

In opposition, Plaintiff argues that he is "only required to hold an objectively reasonable belief that a law or public policy was violated." (Pl. Opp'n at 14.) He continues: "It is respectfully submitted that, given the sensitive nature of the particular type of workplace in this matter, a nuclear power plant, public policy demands that any employee at such a facility should feel free to raise any safety or security concern without the threat of harassment, intimidation, or termination." (<u>Id.</u> at 15.) Plaintiff cites no evidence in support of the reasonableness of his belief that laws, rules or

24

regulations were violated, with the arguable exception of his
own testimony, in which he asserts a subjective belief that the
conduct violated the law.

CEPA requires a plaintiff to "set forth facts that would
support an objectively reasonable belief that a violation has
occurred." Dzwonar, 177 N.J. at 464. The Court's task is to
determine whether, based on the record, a reasonable juror could
find that plaintiff had an objectively reasonable belief that
the complained-of conduct violated a law, rule, regulation or
clear mandate of public policy. See id.; Battaglia, 214 N.J. at
558; Maimone v. City of Atl. City, 188 N.J. 221, 233 (2006)
(stating that the plaintiff "only has to show that he had an
'objectively reasonable belief' in the existence of such a
violation"). Plaintiff need not identify a law, rule, regulation
or policy that Defendant actually violated if all the facts
asserted are true, but there must be "a substantial nexus
between the complained-of conduct and a law or public policy . .
. ." Dzwonar, 177 N.J. at 464. The New Jersey Supreme Court has
instructed trial courts to "be alert to the sufficiency of the
factual evidence and to whether the acts complained of could
support the finding that the complaining employee's belief was a
reasonable one." Battaglia, 214 N.J. at 558.

After briefing on this motion was complete, and after the
Court held oral argument, the New Jersey Supreme Court issued an

opinion on the proof required to sustain a CEPA claim and
appears to have heightened the burden on CEPA plaintiffs. <u>See</u>
<u>Hitesman v. Bridgeway, Inc.</u>, No. A-73-12 (N.J. June 16, 2014).
The Supreme Court held that "a plaintiff asserting that his or
her employer's conduct is incompatible with a clear mandate of
public policy concerning the public health must, at a minimum,
<u>identify</u> authority that applies to the activity, policy or
practice of the employer." <u>Id.</u>, slip op. at *3 (emphasis added).
The Supreme Court further observed that "a pivotal component of
a CEPA claim is the <u>plaintiff's</u> <u>identification</u> of authority in
one or more of the categories enumerated in the statute that
bears a substantial nexus to his or her claim," and instructed
the trial court to "enter judgment for a defendant when no such
law or policy is forthcoming." <u>Id.</u> at *28 (citing <u>Dzwonar</u>, 177
N.J. at 463) (emphasis added).  The Supreme Court continued:

> Whether a CEPA plaintiff invokes a law, rule,
> regulation, declaratory ruling, or professional code of
> ethics . . . under N.J.S.A. 34:19-3(a)(1) or (c)(1), or
> alleges employer conduct 'incompatible with a clear
> mandate of public policy concerning the public health'
> under N.J.S.A. 34:19-3(c)(3), <u>the</u> <u>plaintiff</u> <u>must</u>
> <u>identify</u> the authority that provides a standard against
> which the conduct of the defendant may be measured.

(<u>Id.</u> at *28-*29) (emphasis added). In summary, the Supreme Court
concluded that "to present a cognizable retaliation claim . . .
under N.J.S.A. 34:19-3(a)(1) and (c)(1), or . . . under N.J.S.A.
34:19-3(c)(3), <u>a</u> <u>plaintiff</u> <u>must</u> <u>present</u> authority meeting the

26

statutory criteria" -- meaning a law, rule regulation or clear mandate of public policy -- "that serves as a standard for the employer's conduct. In the absence of such authority, the CEPA claim fails." Id. at *33 (emphasis added).

Prior to the Hitesman opinion, the governing framework for CEPA claims was provided by Dzwonar, which held that "the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Dzwonar, 177 N.J. at 464 (emphasis added). Dzwonar thus appeared to permit the trial court to identify a law or public policy that shared a substantial nexus with the complained-of conduct, if no citation to authority was forthcoming from the plaintiff. Although the majority opinion in Hitesman continues to cite that language from Dzwonar with approval, see Hitesman, slip op at *24, *26,[8] the dissenting opinion in Hitesman highlights how the law now places the burden squarely on the plaintiff to identify

---

[8] More precisely, the Hitesman majority specified that "[t]he trail court must determine whether there is a substantial nexus between the complained-of conduct and a 'clear mandate of public policy' identified by the court or the plaintiff." Hitesman, slip op. at *26 (citing Dzwonar, 177 N.J. at 464). After Hitesman, it is unclear whether the court may initially identify the source of public policy, but it is clear that the plaintiff must demonstrate the existence of such a source of law or other authority that sets the governing standard for the employer's conduct, and prove it to the factfinder. Hitesman, slip op. at *30, *32-*33.

some source of authority by which the employer's conduct and the

plaintiff's reasonable belief is measured:

> The majority cites no legal authority for the new demands
> it places on CEPA plaintiffs. . . . Until today, no case
> required a plaintiff to make a hard copy of a federal or
> state statute or regulation, such as the CDC guidelines,
> and place or read it into evidence.

Id., slip op. at *7 (Albin, J., dissenting)). The strong

language in Hitesman suggests that the plaintiff, and not the

Court, must initially identify the source of law or public

policy with which the complained-of conduct shares a substantial

nexus, although the uncritical quotation of Dzwonar suggests

that the Dzwonar framework remains in full force.[9] In any event,

Hitesman did not change the requirement that a CEPA plaintiff

must adduce sufficient proof for a jury to find that his or her

belief that a law, rule or regulation had been violated, or a

clear mandate of public policy contravened, was objectively

reasonable. In many cases, the best evidence of a belief's

objective reasonableness is a source of law or policy that

shares a substantial nexus with the complained-of conduct.

Here, in the motion briefs and at oral argument, Plaintiff

initially took the position that he did not need to identify any

specific law or policy to satisfy the reasonable belief prong of

---

[9] The issue of whether the trial court could initially identify a
source of law or policy was not at issue in Hitesman, where the
plaintiff identified three possible sources. Hitesman, slip op.
at *33.

his CEPA claim. His evidence of the reasonableness of his belief that certain conduct violated a law or policy consisted solely of his own testimony that he believed that a law or policy had been violated. Plaintiff cited no other evidence to support a finding that his belief was objectively reasonable. He relied exclusively on these assertions:

> 10. Based upon my training, without being able to cite it specifically, as of April 15, 2009, I believed that there was a statute, rule, or regulation prohibiting bringing cameras into a nuclear facility without a valid camera pass.

> 11. Based on my training and the daily Security Information Bulletin I received at the beginning of every shift,[10] without being able to cite it specifically, as of February 14, 2010, I believed that there was a statute, rule, or regulation requiring an armed nuclear security officer to self-report being under the influence of alcohol within five hours of reporting for duty.

(Fischer Cert. ¶¶ 10-11.) He made no similar statement about his belief regarding the chair removal in 2008. These statements may support a finding of a subjective belief, but do not, on their own, permit a finding of an objectively reasonable belief that a law or regulation was being violated.

At oral argument pre-Hitesman, heeding the language of Dzwonar permitting the Court to identify a law or public policy, the Court raised the question of whether certain Nuclear

---

[10] Plaintiff does not indicate that any Security Information Bulletin is contained in the present record. Plaintiff does not cite to or describe any such bulletin.

Regulatory Commission regulations could provide an objectively reasonable basis for Plaintiff's belief regarding prohibition of alcohol use within five hours of reporting to duty. Specifically, the Court identified regulations that outline fitness-for-duty programs for armed security force officers at nuclear facilities. 10 C.F.R. § 26.4(a)(5). The Nuclear Regulatory Commission regulations provide for mandatory drug and alcohol testing of an individual "[i]n response to an individual's observed behavior or physical condition indicating possible substance abuse or after receiving credible information that an individual is engaging in substance abuse . . . ." 10 C.F.R. § 26.31(c)(2). The regulations expressly name "alcohol" as a "substance[] tested." 10 C.F.R. § 26.31(d)(1). The regulations provide that

> Any individual who is determined to have been involved
> in . . . the consumption of alcohol within a protected
> area of any nuclear power plant . . . or while performing
> the duties that require the individual to be subject to
> this subpart shall immediately have his or her
> authorization unfavorably terminated and denied for a
> minimum of 5 years from the date of the unfavorable
> termination of authorization.

10 C.F.R. § 26.75(c).

The Court invited the parties to file supplemental briefs to discuss whether these regulations play any role in this suit. In response, Plaintiff initially continued to assert that "he is not required to be able to cite, chapter and verse, the statute,

regulation or policy he sought to enforce . . . ." [Docket Item
48 at 2.] However, he ultimately did endorse the regulations
raised by the Court:

> If the court agrees . . . that there at least must be an
> identifiable law, regulation or policy . . . the court
> may, as it has done here, identify that law or public
> policy. One of the several issues raised by the plaintiff
> as being whistleblowing activity was a violation of the
> facility fitness-for-duty requirement promulgated
> pursuant to 10 C.F.R. § 26.4(a)(5).

[Id.]

Given the unique confluence of the procedural history of
this case with the new opinion in Hitesman, the Court finds that
Plaintiff's endorsement of the regulations identified by the
Court suffices to meet the burden of identifying authority by
which the employer's conduct and the objective reasonableness of
his belief is measured.

The Court next must determine whether Plaintiff has adduced
sufficient evidence from which a jury could reasonably conclude
that there was a substantial nexus between the complained-of
conduct and regulations, and whether Plaintiff's belief that
some regulation had been violated was objectively reasonable.
The above-cited NRC regulations admittedly concern fitness-for-
duty programs and drug testing, and do not expressly dictate
that an intoxicated security officer must self-report.
Nonetheless, a jury could reasonably conclude that if drug
testing is mandated by law, and if an officer may be fired for

31

failing a substance test, a fellow officer could reasonably believe that some unidentified regulation prohibits an armed security officer at a nuclear facility from reporting for duty while intoxicated.

Other record evidence supports this conclusion. The record contains the Wackenhut Safety Handbook, which Plaintiff testified he received in 2007 during initial training. (Wackenhut Safety Handbook (marked as D-30 within Def. Ex. C) [Docket Item 40-9 at 6] at 32; Fischer Dep. at 304:21-305:15.) The handbook states that "any use . . . or possession of . . . alcohol while on duty or on Company property is an offense subject to termination of employment." (Id.) It continues: "Off-the-job use of alcohol which adversely affects an employee's job performance is proper cause for administrative or disciplinary action up to and including termination of employment." (Id.) The handbook does not state that being intoxicated on the job is a violation of law, as opposed to a violation of the employer's code of conduct, but a jury could consider this evidence, in conjunction with the NRC drug-testing regulations, as support for Plaintiff's position that his belief was objectively reasonable.

It is hardly a stretch to conclude that the intoxication or similar impairment of an armed security officer at a nuclear facility is a safety risk to the public. See Mollo v. Passaic

Valley Sewerage Comm'rs, No. 07-1655, 2009 WL 5216976, at *9
(D.N.J. Dec. 30, 2009) (discussing that "persons who have
routine access to dangerous nuclear power facilities . . . 'can
cause great human loss before any signs of impairment become
noticeable to supervisors or others'"), aff'd, 406 F. App'x 664
(3d Cir. 2011); EEOC v. U.S. Steel Corp., No. 10-1284, 2013 WL
625315, at *19 (W.D. Pa. Feb. 20, 2013) (stating that "private
security officers . . . and nuclear plant operators" are "jobs
that, if performed badly, could result in harm to others in the
general public").

    These cases, the regulations, the Handbook, and Plaintiff's
testimony, could support a jury finding that plaintiff had an
objectively reasonable belief that Officer Crowell violated a
regulation or clear mandate of public policy bearing on public
safety. Plaintiff need not prove that his violation actually
would have violated a regulation; he need only show a
substantial nexus between a regulation and the complained-of
conduct. Hitesman, slip op. at *25 (citing Dzwonar, 177 N.J. at
464). The record contains a sufficient showing of a substantial
nexus, and therefore, the Court cannot determine as a matter of
law that Plaintiff's belief was not objectively reasonable.
Plaintiff has adduced evidence from which a reasonable
factfinder could find sufficient to establish the first element
of his CEPA claim, to the extent the claim is based on the

disclosure of Officer Crowell's intoxicated state to his supervisor.

By contrast, Plaintiff has not identified any law, rule, regulation or clear mandate of public policy relating to camera passes at nuclear facilities or chairs for security guards near the door to the roof of a nuclear facility. Plaintiff adduces no evidence that he had an objectively reasonable belief that Officer Glasby violated the law by permitting a visitor to enter without a camera pass. Plaintiff does not even attempt to testify in his certification that he believed the existence of a chair near the door to the roof of the property violated the law for CEPA purposes. Plaintiff's CEPA claims based on the chair and the camera-pass incidents fail as a matter of law because Plaintiff has not adduced sufficient evidence to "support the finding that the complaining employee's belief was a reasonable one." Battaglia, 214 N.J. at 558.

**D. Whether Plaintiff engaged in whistleblowing activities**

Defendant next argues that "Plaintiff's alleged complaints are not whistleblowing activities because they involve complaints of a private nature rather than complaints about public harm." (Def. Mot. at 12.) Defendant maintains that "violative activity must 'have public ramifications,' as opposed to merely consisting of a private dispute between an employer

and employee." (<u>Id.</u>, quoting <u>Maw v. Advanced Clinical Commc'ns,</u>
<u>Inc.</u>, 179 N.J. 439, 445 (2004).)

While it is true that an employee proceeding under N.J.S.A.
34:19-3c(3) "must make the additional showing that the 'clear
mandate of public policy' . . . is one that 'concern[s] the
public health, safety or welfare or protection of the
environment,'" the New Jersey Supreme Court has unequivocally
stated that "[t]his requirement is 'unique' to c(3)." <u>Maimone</u>,
188 N.J. at 231. In other words, an employee proceeding under
N.J.S.A. 34:19-3c(1) need not make the same showing concerning
"the public health, safety or welfare or protection of the
environment," only that the whistleblower reasonably believed
that the complained-of conduct violated a law, rule or
regulation. To the extent Plaintiff proceeds under c(1), he need
not show that the complained-of conduct implicated public
health, safety or welfare. However, even under c(3), Plaintiff
has made a sufficient showing that Crowell's intoxication
implicated public health, safety or welfare.

CEPA "'is intended to protect those employees whose
disclosures fall sensibly within the statute; it is not intended
to spawn litigation concerning the most trivial or benign
employee complaints.'" <u>Battaglia</u>, 214 N.J. at 558 (quoting
<u>Roach</u>, 164 N.J. at 613-14). CEPA does not protect "a complaint
about a minor violation of a company's internal policy . . . ."

35

Id. at 561. Rather, "CEPA is designed to protect employees who
blow the whistle on illegal or unethical activity committed by
their employers or co-employees." Roach, 164 N.J. at 609-10; see
also DeLisa v. Cnty. of Bergen, 165 N.J. 140, 146 (2000) ("'CEPA
covers employees who objects to the conduct of co-workers'")
(citing Higgins v. Pascack Valley Hosp., 158 N.J. 404, 419
(1999)).

Here, the disclosure of information to a supervisor that an
armed security officer at a nuclear facility was intoxicated or
suspected to be intoxicated is not a "trivial or benign employee
complaint" or a "minor violation" of a company's internal
policy. Rather, Plaintiff's disclosure concerned a serious
infraction with potentially major public safety implications.
Indeed, Crowell was fired on the spot. Therefore, Plaintiff
engaged in protected activity when he blew "the whistle on
illegal or unethical activity committed by" his co-employee.
DeLisa, 165 N.J. at 146.

Plaintiff contends that he engaged in other protected
activity by submitting "a written list of suggestions (a
'deficiency list') to make the site safer." (Pl. Opp'n at 15,
citing CMF ¶ 31). Plaintiff certifies that "I drafted a list of
safety concerns and suggestions that I shared with management of
PSEG Nuclear and the defendant, including Project Manager Hunter
Sawders, in the spring of 2010 during one of our several

36

meetings, prior to my suspension." (Fischer Cert. ¶ 26.)
Plaintiff's suggestions include "pay[ing] closer attention" to
certain matters with security implications, increasing the use
of police dogs, putting the "best shooters from each team" in
the proper location to best prevent an attack, and sending a
"Petition to Congress" to change rules about the religious
rights of security guards. (Fischer Cert. Ex. A.) Submitting
this list to management is not whistleblowing activity within
the meaning of CEPA, because the "list of safety concerns" does
not disclose activities, policies or practices that Plaintiff
believed were in violation of a law, rule, regulation or public
policy. See N.J.S.A. 34:19-3a(1); see also Hitesman v. Bridgeway
Inc., 430 N.J. Super 198, 212 (App. Div. 2013) ("It is not
enough for an employee to rest upon a sincerely held--and
perhaps even correct--belief that the employer has failed to
follow the most appropriate course of action . . . ."), aff'd,
No. A-73-12 (N.J. June 16, 2014). Plaintiff's list suggests how
to improve security, not how to correct policies or practices
that were believed to be in violation of law. Plaintiff has not
identified any violation of a statute, rule or regulation that
he was reporting to his employer in this list, as required by
CEPA. To the extent Plaintiff's CEPA claim is based on this list
of safety concerns, Defendant is entitled to summary judgment
because suggesting improvements that do not address allegedly

illegal or prohibited policies, practices or conditions simply
is not whistleblowing activity within the meaning of CEPA.

In the Amended Complaint, Plaintiff pleads that his
termination was in retaliation for "speaking out or threatening
to speak out about unfair labor practices to the National Labor
Relations Board." (Am. Compl. ¶ 38.) Plaintiff's summary
judgment opposition brief appears to abandon this argument.
Although Plaintiff's statement of facts and certification refer
to Plaintiff's decision not to file charges with the NLRB,
Plaintiff now argues that he engaged in protected whistleblowing
activity only "[b]y sharing his concerns with management . . .
." (Pl. Opp'n at 15.) Plaintiff no longer argues that filing
charges with the NLRB constituted protected activity for
purposes of his CEPA claim. Rather, he argues that he "brought
to the attention of management the fact that he was being
harassed and intimidated by his co-workers after reporting a
number of specific safety issues," and he "submitted a written
list of suggestions (a 'deficiency list') to make the site
safer." (Id. at 15.) Plaintiff refers to "several" meetings in
May 2010 in which he "convey[ed] his concerns to management,
including the deficiency list." (Id.) Because Plaintiff does not
argue that telling Sawders that "he was considering 'going to
the NLRB'" (CMF ¶ 33) constituted protected activity, the Court
deems this argument waived. See Aetna Health Inc. v. Davila, 542

38

U.S. 200, 212 (2004) (deeming an argument waived when the
"[r]espondents did not identify this possible argument in their
brief in opposition"); Travitz v. Ne. Dep't ILGWU Health &
Welfare Fund, 13 F.3d 704, 711 (3d Cir. 1994) ("When an issue is
not pursued in the argument section of the brief, the appellant
has abandoned and waived that issue on appeal."); Person v.
Teamsters Local Union 863, No. 12-2293, 2013 WL 5676739, *4
(D.N.J. Oct. 16, 2013) ("Where a party only defends a subset of
claims in opposition to a dispositive motion, the Court will
construe those claims that were not defended as abandoned.");
Leone-Zwillinger v. N.J., No. 04-5103, 2007 WL 1175786, at *3
(D.N.J. Apr. 19, 2007) ("when a party fails to offer any
argument or evidence . . . in opposition to defendants' motion
for summary judgement [sic], such claims may be deemed to be
have been abandoned") (citing Desyatnik v. Atl. Casting & Eng'g
Corp., No. 03-5441, 2006 WL 120163, at *1 (D.N.J. Jan. 17,
2006)).

Thus, Plaintiff's reporting to management of Crowell's
suspected intoxication on the job remains as the sole protected
activity under CEPA in this case.

### E. Adverse employment action and causation

The parties agree that Plaintiff suffered an adverse
employment action when he was terminated, but disagree about
whether a causal connection exists between Plaintiff's

39

whistleblowing and his termination. Defendant argues that "the competent record evidence shows that Plaintiff voluntarily terminated his employment when his attorney . . . confirmed Plaintiff would not be returning to work at Salem Hope Creek despite all of G4S's assurances that it would not tolerate any mistreatment of him by his fellow Union officers." (Def. Mot. at 13.) Defendant contends that "Plaintiff's employment came to an end only because of his own acts -- namely, his voluntary abandonment of his employment when he was required to return to work." (Id. at 14-15.)

Plaintiff argues that his employer gave him "no reasonable alternative" but to refuse to return to work, and that the "only option, after Mr. Fischer turned down the transfer to New Hampshire, was for him to return to work, to the place with his armed and unhappy co-workers. This was an option no reasonable person could have accepted under the circumstances." (Id. at 16.) Plaintiff argues that he suffered a "constructive termination" because management showed "no willingness to resolve the problems" and "made no real effort to reintroduce him into the workforce." (Id. at 16-17.) Plaintiff contends that he "was attempting to reach a resolution and was forced to abandon his job. The only alternative explanation, to be determined by the fact-finder, is that G4S was tired of having

40

an officer not 'go with the flow' and who regularly made waves .
. . ." (Id.)

In a CEPA case, the plaintiff bears the burden of proving
that the protected activity was "a substantial or determinative,
motivating factor" in the adverse employment action. Donofry v.
Autotote Sys., Inc., 350 N.J. Super. 276, 273 (App. Div. 2001);
see also Blizzard v. Exel Logistics N. Am., Inc., No. 02-4722,
2005 WL 3078175, at *9 (D.N.J. Nov. 15, 2005) ("it is
Plaintiff's burden to establish the causal connection; it is not
Defendant's burden to disprove causation"). A plaintiff may
demonstrate a causal link using circumstantial evidence. Kachmar
v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997).
Temporal proximity or a pattern of antagonism on the part of the
employer can raise the inference of causation. Espinosa v. Cnty.
of Union, 212 F. App'x 146, 153 (3d Cir. 2007) (quoting Kachmar,
109 F.3d at 177). In addition, the "'proffered evidence, looked
at as a whole, may suffice to raise the inference.'" Id.

Plaintiff's case bears a strong resemblance to Espinosa.
There, plaintiff Espinosa, a corrections officer in the Union
County Jail, witnessed fellow officers abuse detainees, and
agreed to testify against the offending officers. Espinosa, 212
F. App'x at 149. Espinosa and the Prosecutor's Office agreed
that "it would be too dangerous for Espinosa to continue to work
inside the Jail," based on a "'long history of intimidation and

41

retaliation against corrections officers in the Union County
Jail who provide information with regard to the conduct of
fellow corrections officers.'" Id. Accordingly, Espinosa was
permitted to leave his job, with pay, until the conclusion of
the trials. Id. In August 2000, after the trials were complete
and a full five years after Espinosa witnessed the original
incident, a County official discovered Espinosa was still on the
payroll, and ordered him to return to his job or resign. Id. at
150. Espinosa did not return to work, and the County placed him
on leave without pay. Id. A few months later, the County
initiated a disciplinary action against Espinosa, and, at the
hearing, Espinosa argued that "he could not return to the Jail
out of concern for his own safety." Id. The County determined
that "Espinosa had abandoned his job," and terminated him. Id.
Espinosa sued, arguing, among other things, that he was fired in
retaliation for his testimony against fellow officers, in
violation of CEPA. Id.

　　　The district court granted summary judgment in favor of the
County, and the Third Circuit affirmed. Id. at 151, 154. The
Third Circuit concluded that a jury could not reasonably find
the County terminated Espinosa in retaliation for his protected
activity for three reasons. First, Espinosa admitted in his
deposition that the County would not have fired him had he
returned to his job. Id. at 153. Second, Espinosa knew that the

County intended to take him off the payroll at the conclusion of the trials. Id. at 154. Finally, "Espinosa presented no evidence supporting his claim that the County acted out of animus toward him." Id.

Plaintiff presents an analogous, though not identical, case.[11] The record shows that, here, like in Espinosa, after Plaintiff made his protected disclosure, Defendant accommodated Plaintiff by placing him on paid leave for the duration of an investigation into Plaintiff's allegations of harassment. When the impetus for paid leave ended, Defendant requested Plaintiff to return to work. In this case, as in Espinosa, Plaintiff declined to return to work, asserting that he feared for his personal safety. Defendant terminated Plaintiff for not returning to work as directed.

Like the plaintiff in Espinosa, Plaintiff has not adduced evidence to support a finding of causation, i.e., that Plaintiff's disclosure of Crowell's intoxicated state was a motivating factor in Plaintiff's termination. Because the termination came more than seven months after his protected disclosure, the temporal proximity is not enough to raise a reasonable inference of causation. Neither does Plaintiff's

---

[11] The time the plaintiff was on paid leave in Espinosa far exceeds the time Plaintiff was on leave in this case. Plaintiff in this case also turned down an alternate accommodation of a transfer to New Hampshire.

evidence suggest a pattern of antagonism by Defendant. Taken as a whole, the evidence of record does not raise an inference of causation.

Plaintiff has not adduced evidence to establish a constructive termination. A constructive discharge under New Jersey law occurs "when an employer knowingly permit[s] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 27-28 (2002) (internal quotation marks omitted); see also Donelson v. DuPont Chambers Works, 206 N.J. 243, 257 (2011) (citing Shepherd). A constructive discharge claim requires "more egregious conduct than that sufficient for a hostile work environment claim." Shepherd, 174 N.J. at 28. The terminated plaintiff must show "not merely 'severe or pervasive' conduct, but conduct that is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." Id. (quoting Jones v. Aluminum Shapes, Inc., 339 N.J. Super 412, 428 (App. Div. 2001)). The "standard envisions a 'sense of outrageous, coercive and unconscionable requirements.'" Id.

Here, Plaintiff argues that Defendant was tired of Plaintiff making "waves," but does not point to evidence to support that notion. Plaintiff reaches this conclusion by stating that two of the three options discussed (transfer and

44

severance) were eliminated, leaving Plaintiff with no choice but
to return to an unsafe work place. (Pl. Opp'n at 16-17.) To the
contrary, Sawders commended Plaintiff, in one of the
conversations Plaintiff secretly recorded to document
management's unfiltered words, for reporting performance lapses:
"part of what you were doing is exactly what everybody should be
doing and they're not." (Tr. of 9/10/10 Conversation at 74:17-
18.) Kindelein also told Plaintiff: "I'm your advocate. Somebody
is out there giving you a hard time, you call me. All right?"
(Id. at 142:1-3.) He added: "You got a lot of people on your
side, okay?" (Id. at 145:17-18.) In another conversation,
Bruecks told Plaintiff: "I want you to feel obviously as open
and as free as you were to continue to identify and raise
issues. . . . And you know we welcome that, and that we want to
make sure that that doesn't stop." (Tr. of 9/10/10 Conversation
with Fischer, Kindelein & Bruecks at 98:16-17.)

   Plaintiff does not adduce evidence from which a reasonable
jury could find a constructive termination. He does not adduce
evidence to show that a reasonable person would find the work
environment so intolerable that he or she would resign rather
than return to work under the assurances management consistently
gave him. Plaintiff's evidence does not establish a severe or
pervasive hostile work environment, but rather, viewing the
evidence most favorably to Plaintiff, a handful of pointed

comments by co-workers over the course of two years that did not result in any physical injury to Plaintiff or his property.[12] Plaintiff was never the victim of violence. Even these encounters did not impair Plaintiff's ability to do his job, and management gave clear signals that they continued to support him and would deal with anyone who tried to hassle him. His co-workers' behavior, though unwelcoming, was not "outrageous, coercive and unconscionable" within the meaning of the constructive discharge doctrine. Shepherd, 174 N.J. at 28.

Plaintiff certainly does not show that Defendant endorsed harassing behavior or exhibited animus toward Plaintiff. To the contrary, it is undisputed that Defendant backed Plaintiff by firing Crowell, accommodating Plaintiff with paid leave, investigating his allegations,[13] soliciting suggestions from him about ameliorating the situation, following through on the suggestion to arrange a transfer for him, pledging their support of him, promising to discipline or terminate harassing co-workers, and assuring him that changes to the work environment had been made and more were planned. Sawders described how he

---

[12] Plaintiff does not claim that the emotional or mental toll of the threats necessitated his employment decision. Rather, he argues that the workplace was physically unsafe.

[13] Plaintiff expressed his belief that the investigator told Defendant what it wanted to hear, and "not necessarily the truth." (Tr. of 9/10/10 Conversation with Fischer, Kindelein & Bruecks at 93:20-23.)

had spoken with every shift and each team leader, and he
explained that he was prepared to enforce rules that previously
had not been enforced. G4S's attorney explained in a letter to
Plaintiff's attorney that management "has discussed with Mr.
Fischer that it would not 'turn him loose' with his colleagues,
but that it planned to return him to work through a number of
measures designed to supervise and observe the work force around
him, including an escort for a period of time." [Docket Item 40-
11 at 47 (marked as D-48 within Def. Ex. C)]. The attorney also
informed Plaintiff's attorney that "the company will implement a
number of pre-planned measures for Mr. Fischer's safety and
smooth transition back to his current job." [Id.]; see also
Fischer dep. at 394:6-11 (admitting that G4S's attorney
represented to Plaintiff that the company would implement
preplanned measures for Plaintiff's safety and a smooth
transition back to work).

Management did not ignore suggestions by Plaintiff to
improve the work environment. In Plaintiff's taped
conversations, Plaintiff declined to provide Defendant with
names of co-workers that continued to concern him, although
Sawders told him that Mizenis, his supervisor who had a history
with Plaintiff, would be placed on a different shift. (Fischer
dep. at 347:13-17.) At oral argument, Plaintiff's counsel
posited that none of the harassers had been disciplined, but

47

Plaintiff himself expressed ambivalence about Defendant terminating anyone, fearing the move would make the work environment less safe. Management repeatedly stated that they wanted Plaintiff to return to work and assured him that if anyone harassed him upon his return, the harasser would be disciplined or terminated. There is no evidence that Defendant ever disregarded any threat to Plaintiff's safety or acquiesced to a pattern of harassment by any of Plaintiff's co-workers. There is no evidence that Defendant disapproved of Plaintiff's whistleblowing; the record undisputedly shows that his employer encouraged it.

At Plaintiff's request, Defendant arranged for Plaintiff's transfer to New Hampshire, the nearest G4S facility, but Plaintiff ultimately declined the transfer because he did not want to relocate his family, take a pay cut or lose his union seniority as required by the New Hampshire unit's collective bargaining agreement. Defendant rejected Plaintiff's demand for an $800,000 severance package, more than ten times his annual salary.[14] Nothing in the record suggests that Defendant's offer of transfer was disingenuous or deliberately unattractive. The fact that Defendant declined to pay Plaintiff more than 10 times his annual income in severance does not permit an inference that

---

[14] At oral argument, Plaintiff's counsel stated Plaintiff earned approximately $70,000 per year.

Defendant retaliated against Plaintiff. Nothing in the record
demonstrates that Plaintiff attempted to negotiate a lower
severance package, when his first demand was rejected.  In sum,
the record does not support Plaintiff's contention that he was
constructively discharged or that Defendant harbored animus
toward Plaintiff.

     Plaintiff's own statements undercut his contention that his
physical safety was at risk. Although Plaintiff stresses that
the work environment was dangerous because all of his fellow
officers were armed, Plaintiff himself stated to management
prior to his termination that he did not fear that he would be
shot by a co-worker. (See Tr. of 9/09/10 Conversation at 103:15-
16.) Plaintiff's counsel reiterated this admission at oral
argument. No one ever threatened to beat Plaintiff up. (See Tr.
of 9/10/10 Conversation with Fischer, Kindelein & Bruecks at
100:10-14 ("Did anybody say they're going to beat me up or
anything that -- like that? No . . ."). ) His own words to
management evince a fear of a hypothetical possibility -- not a
likelihood, not a certainty -- that his physical safety was at
risk. (See Tr. of 9/10/10 Conversation with Fischer, Kindelein &
Sawders at 3:12-17 ("somebody . . . could possibly do something
physically"); id. ("something like that could possibly happen to
me").)

The evidence may support a finding of Plaintiff's subjective fear, but it does not substantiate that such a fear was reasonable. The only physical gesture ever directed at Plaintiff was a co-worker kicking his chair at a morning meeting. That co-worker later apologized and, eventually, left the work force. Plaintiff received, at most, a handful of veiled threats from co-workers spread over two years prior to his being placed on leave. Most of the threats were nonspecific and not spoken directly to Plaintiff -- "Fischer is going to get his," for example, which was a message Perdue received on his cell phone -- and the vast majority of them were made prior to Plaintiff going on leave. Some of the friction came not from words but from a type of shunning, as when some officers would leave the lunchroom. At oral argument, Plaintiff's counsel identified only one statement made to Plaintiff in the months after he left the facility, which indicated that Plaintiff would be "challenged" upon his return. Plaintiff testified that the "worst" statement from one officer was, "If we were in the military we would pay you a visit at night." (Fischer dep. at 160:16-161:2.) Plaintiff presents no evidence of threats to his personal safety, no threats of any specificity against his person or property, no harassing phone calls or letters or notes or photos, no evidence that his co-workers acted violently against him, no pledges of violence against him, and no evidence

50

of any damage or injury to his person or property in the entirety of his employment at the nuclear facility. Plaintiff never experienced any physical altercation aside from his chair being kicked in 2008, and no one ever threatened to beat him up. His fears of physical harm, though perhaps sincerely held, are not reasonably founded on the present record.

None of the evidence discussed above permits an inference that Plaintiff's disclosure of Crowell's intoxicated state was a substantial or determinative factor in Plaintiff's termination. See Donofry v. Autotote Sys., Inc., 350 N.J. Super. at 273. The record does not support a finding of likely physical harm to Plaintiff upon his return to work. No reasonable factfinder could conclude that the comments and text messages Plaintiff's co-workers made and sent were so outrageous, coercive, or unconscionable that a reasonable person would find the work environment to be intolerable. More importantly, there is simply no evidence that the Defendant or its managers condoned, encouraged or ignored the comments of Plaintiff's co-workers, nor that Defendant bore any animus against Plaintiff as a result of any CEPA-protected activity. Based on this record, a reasonable jury could only conclude that Plaintiff abandoned his job, not that he was constructively terminated by his employer. Therefore, Plaintiff fails to establish causation, and Defendant is entitled to summary judgment on the CEPA claim.

**F. Pretext**

Even if Plaintiff could establish a prima facie case,
including causation, Plaintiff fails to "demonstrate such
weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons
for its action that a reasonable factfinder <u>could</u> rationally
find them 'unworthy of credence.'" <u>Burton v. Teleflex Inc.</u>, 707
F.3d 417, 427 (3d Cir. 2013).

Defendant argues in its papers that Plaintiff abandoned his
job after being instructed to return to work. At oral argument,
Defendant was willing to concede, for purposes of this motion,
that Defendant terminated Plaintiff for the legitimate,
nondiscriminatory reason that Plaintiff was a "no call, no show"
for work on September 29 and October 4, 2010. In response,
Plaintiff argues that the evidence suggests

> that he decided not to return to work because he feared
> for his safety in an environment where his coworkers
> carry automatic weapons and management has shown no
> willingness to resolve the problems and that his
> employer made no real effort to reintroduce him into the
> workforce. The same facts that support the causal
> connection between Mr. Fischer's whistleblowing activity
> and his termination, as detailed above, support the
> proposition that the reason given for his termination
> was pretextual.

(Pl. Opp'n at 17-18.)

Plaintiff's case for pretext relies on the assertion that
Defendant showed "no willingness to resolve the problems" and

52

"made no real effort to reintroduce him into the workforce."[15]

(Id. at 17.) Plaintiff contends that Defendant did not take

seriously what he calls "an apparent investigation." (Id. at

15.)

> In his meeting of September 9, 2010, Mr. Fischer . . .
> was confronted inexplicably by Bob Kindelein with the
> assertion that he (Mr. Fischer) had told the
> investigator that he had "made all that up," meaning his
> concerns. (CMF, para. 46) This trivialization of his
> concerns only solidified the plaintiff's belief that he
> was being marginalized by not only his co-workers but
> also by management. (CMF, para. 47) Furthermore, despite
> there clearly being a report generated as a result of
> the four-month-long investigation, as evidence by Mr.
> Sawders own comment, id. at para. 48, Mr. Sawders failed
> to take matter seriously enough to even remember whether
> he ever saw a report. (CMF, para. 48)

(Pl. Opp'n at 15-16.)

Plaintiff mischaracterizes the conversation with Kindelein.

In the recorded conversation, Kindelein sought to confirm both

whether Plaintiff told the investigator whether he had found

Katie Harris asleep on the job and "to clarify was she or wasn't

she." (Def. Ex. F at 6:10-17.) In the excerpt cited by

Plaintiff, Kindelein did not accuse Plaintiff of making up his

safety concerns, as Plaintiff suggests. The exchange unfolded:

> MR. KINDILIEN [sic]: . . . when you were talking to Domby
> [the investigator], you did not allege that she was
> sleeping.

---

[15] The Court has already discussed how Plaintiff admitted he did
not fear that he would be shot and no one threatened to beat him
up, and so the fact that Plaintiff's "coworkers carry automatic
weapons" is not evidence that Plaintiff's termination was
pretextual.

MR. FISCHER: No.

MR. KINDILIEN [sic]: Okay. Well, that's what I'm trying
to establish. Not whether you made it up or not. I threw
that out there. . . . [T]he big thing is, you did not
openly allege that you caught her sleeping.

MR. FISCHER: Absolutely not.

MR. KINDILIEN [sic]:  . . . did you ever say to Joe Kelly
"Yeah, I shut her up, because I said I would come out
with what I know."?

MR. FISCHER: False. Completely fal -- on my God, this is
-- this is -- this is a -- this is a union retaliation.
. . .

MR. KINDILIEN [sic]: I don't know -- I don't know . . .
All I know is . . . I got to look into it.

MR. FISCHER: Okay.

(Id. at 10:16-22, 11:4-24.) Nowhere does Kindelein trivialize

Plaintiff's safety concerns. Rather, Kindelein told Plaintiff

that he was Plaintiff's "advocate" and that "there's going to be

a lot of SCWE things addressed," and urged Plaintiff to contact

him if his co-workers bothered him upon his return to work. (Tr.

of 9/10/10 Conversation at 69:2, 72:17-18, 74:13-14, 142:1-3,

145:17-18.)

Plaintiff next argues that Sawders "failed to take matter

seriously enough to even remember whether he ever saw a report."

(Pl. Opp'n at 16.) Plaintiff cites the following exchange in

Sawders's deposition, taken January 16, 2014, nearly four years

after Crowell was fired and more than three years after

Plaintiff was terminated:

Q: During the time that he was in that administrative position did he report any such issues to you?

A: I don't remember that either.

Q: Now, you said that you instigated or initiated an investigation that was essentially conducted by a third party; do you know the result of that investigation?

A: I don't. If it was ever made available to me, I don't remember.

Q: Do you recall if a written report was generated as a result of that investigation?

A: I'm 99.9 percent sure there was, but I don't recall seeing it.

(Sawders dep. at 31:3-16.) Throughout Sawders's deposition, he states repeatedly that he cannot presently recall certain details about the incidents in question, due to the passage of time. As he explained: "I don't remember . . . because I've been at several plants . . . , but I can no longer remember if it was Salem Hope Creek, South Texas, Monticello, etc. So I'm sorry, I can't answer either one of those questions because I just don't remember." (Id. at 15:7-12.) However, at the time of the events in question, as documented in one of Plaintiff's own recordings, Sawders told Plaintiff, "I want to make sure you know that I'm aware of the issues raised. Obviously, I've seen the investigation." (Tr. of 9/09/10 Conversation at 80:20-81:4.) Sawders's inability to recall the investigation report four years later does little, if anything, to undermine the undisputable fact that Sawders expressed awareness of the

investigation in Plaintiff's own cotemporaneous recordings. Sawders also undisputedly discussed Plaintiff's safety concerns more generally and possible solutions to the problem. Plaintiff points to no evidence that demonstrates that Defendant's pledges of support and safety are "unworthy of credence." Burton, 707 F.3d at 427.

Defendant does not rely on the investigation report as a basis for summary judgment. The report is not in evidence and was not requested by Plaintiff in discovery. Whether Domby's report contained misleading or incorrect information about some of Plaintiff's alleged conduct, or whether Sawders recalls seeing the report, does nothing to undermine Defendant's actual responses to Plaintiff's safety concerns and Defendant's unequivocal expressions of support and protection upon Plaintiff's return to work.

Plaintiff, through his attorney, informed Defendant that he would not be returning to work. (Def. Ex. C [Docket Item 40-11 at 50].) Defendant nonetheless extended the deadlines to report by one week. Defendant terminated Plaintiff for not reporting to work. No reasonable jury could conclude, on the present record, that Defendant's purported reason for terminating Plaintiff was pretext for getting rid of Plaintiff because he reported alleged safety violations. Therefore, even if Plaintiff has established a prima facie case of retaliation, his CEPA claim fails as a

matter of law, and Defendant is entitled to summary judgment as a matter of law.

**V.   Conclusion**

The Court will grant Defendant's motion for summary judgment because, to the extent that Plaintiff's claim is based on his disclosure of Officer Crowell's intoxicated state, Plaintiff has not established a causal link between his disclosure and his termination. Even if he can establish a causal link, he has not met his burden of showing that his termination was pretextual for retaliatory animus. To the extent Plaintiff's claim is based on any other disclosures, Plaintiff's claim fails because he cannot establish (1) that those disclosures constitute whistleblowing activity within the meaning of CEPA, and/or (2) that he held an objectively reasonable belief that the complained-of conduct violated any law, rule, regulation or clear mandate of public policy. An accompanying Order will be entered.

**June 25, 2014**                         **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge